Argued and submitted February 19, reversed and remanded in part; otherwise affirmed July 16, 2003

AMERICAN BANKERS INSURANCE COMPANY,
on behalf of Mortgage One, Inc.,
on behalf of Mortgage Broker Security Bond,
*Plaintiffs,*

*v.*

STATE OF OREGON;
Stauber Real Estate Appraisal, Inc.;
Appraisal Company;
Hanson Appraisals;
James C. Land Real Estate Appraiser, Inc.;
Reinhart & Associates;
Carl Goschie & Associates;
Nationwide Real Estate Tax Services;
On Line Documents;
Kurt Bender Real Estate Appraiser;
Rager Mountain Appraisals;
and Ang Engineering Group, Inc.
*Defendants,*

*and*

EXECUTIVE REPORTING SERVICES;
Precision Appraisals;
Rice Dersham, Inc.;
Oregon Appraisal & Associates;
Appraisal Express, Inc.;
David Griffith Real Estate Appraiser;
Portland Residential Appraisals;
Bratton Appraisal Group;
Garrow Appraisals;
and Lisa G. Farber & Assoc.,
*Respondents,*

*and*

Robert GRAF
and Sandra Graf,
*Appellants.*

0006-05848; A115183

72 P3d 666

Joseph D. McDonald argued the cause for appellants. With him on the opening brief was Palmer, Feltz, Smith & McDonald LLP.

Laura Caldera Taylor argued the cause for respondents Executive Reporting Services and Precision Appraisals. With her on the brief were Michael M. Ratoza and Ratoza Long, P.C. Joining on the brief were respondents Appraisal Express, Inc., David Griffith Real Estate Appraiser, Garrow Appraisals, and Lisa G. Farber & Assoc.

No appearance for respondents Rice Dersham, Inc., Oregon Appraisal & Associates, Portland Residential Appraisals, and Bratton Appraisal Group.

Before Landau, Presiding Judge, and Linder and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

This is an interpleader action brought by American Bankers Insurance Company (American Bankers), a surety for Mortgage One, Inc. (Mortgage One), to determine the validity and priority of claims being asserted against a bond that was posted for Mortgage One's license. Robert and Sandra Graf (the Grafs) asserted a claim against the bond for financial losses they suffered as private lenders under a loan arranged by Mortgage One and asserted a cross-claim against the other parties claiming a right to the bond. Respondents Executive Reporting Services, Inc. (Executive) and Precision Appraisals (Precision) also asserted a claim against the bond based on a broker's failure to pay for credit reports and real estate appraisals that Executive and Precision provided. The Grafs moved for summary judgment on their claim and cross-claim, and Executive and Precision filed a cross-motion for summary judgment. The trial court determined that the Grafs did not have a right to the bond and that Executive and Precision did have such a right. The Grafs appeal, arguing that the trial court erred, as a matter of law, in concluding that they did not have a claim to the bond. We affirm in part and reverse in part.

The facts are not in dispute. Mortgage One is a corporation that is licensed and bonded in Oregon as a mortgage broker. American Bankers entered into a general indemnity agreement with Mortgage One and, as surety for Mortgage One, posted a payment bond in the amount of $50,000.[1] In January 2000, American Bankers began receiving claims against the bond. In an interpleader action, American Bankers admitted liability to the extent of the surety bond posted on behalf of Mortgage One and, as agreed to by the court, deposited the amount of the bond with the court for it to determine who had proper claims against the bond.

Shortly afterwards, the Grafs filed a claim for the entire bond. They allege that one of Mortgage One's mortgage brokers, David Anderton, negotiated with the Grafs for

---

[1] To receive a license under ORS 59.840 to 59.980, ORS 59.850 requires mortgage banker and mortgage broker applicants to file a corporate surety bond of not less than $25,000 and not more than $50,000.

a loan. Specifically, the Grafs agreed to loan $100,000 to Karl and Linda Keener (the Keeners), with Anderton acting as the mortgage broker. In exchange, the Keeners agreed to make monthly payments and granted the Grafs deeds of trust in three separate parcels of real property.[2] The Keeners defaulted on their payment obligations and the Grafs pursued their remedies under the trust deeds. However, after pursuing their remedies, there remained an unpaid sum of approximately $200,000.[3] Pursuant to ORS 59.925, the Grafs moved to recover a portion of that sum against Mortgage One's bond, contending that Anderton made misrepresentations and misleading statements of material fact that induced them to make the loan. ORS 59.925(2)(b). The Grafs also cross-claimed to prevent any other party from recovering any portion of the bond proceeds.

In addition to the Grafs' claim against the bond, approximately 20 other businesses filed against the bond. Most of the claims were brought by businesses that had provided real estate appraisals and credit information to Mortgage One and had, in turn, not been paid for their services. Only two of those businesses, Executive and Precision, have appeared on appeal. Precision provided appraisals to Mortgage One valued at $3,600, in order to help facilitate Mortgage One's consumer real estate loan business. Precision was never paid for those services by Mortgage One. Similarly, Executive provided consumer credit reports to Mortgage One pertaining to potential borrowers for the purchase of residential properties. At the time that Executive brought its claim against the bond, Mortgage One owed Executive approximately $52,000.

In response to the claims by other businesses, the Grafs brought a motion for summary judgment, arguing that they were the only proper claimants to the bond under the plain language of ORS 59.925. They argued that the other claimants were not proper because they were mere "trade

---

[2] The record neither reveals what kind of property the parcels were nor the purpose of the loan.

[3] Although the initial loan amount was only $100,000, Robert Graf averred in his affidavit in support of his cross-motion for summary judgment that he and his wife, "[a]s a result of the loan, and after exhausting all collection possibilities, * * * have collectively incurred damages of not less than $200,000."

creditors," a class of persons that the bond statute was not meant to protect. In turn, Executive and Precision filed a cross-motion for summary judgment, arguing that the Grafs, as private lenders, were not in the class of claimants that ORS 59.925 was meant to protect. Further, Executive and Precision also argued that, under ORS 59.925(2)(a), they could seek recovery for their losses from the bond. The trial court agreed with Executive and Precision, holding that the Grafs were not proper claimants but that respondents were. The court then proceeded to divide the $50,000 bond among respondents.

The Grafs raise two arguments. In their first argument, they contend, as they did below, that the trial court erred when it found that they were not within the class of claimants who are entitled to collect against the posted bond under ORS 59.925. In their second argument, the Grafs contend that the trial court also erred when it determined that Executive and Precision are within the class of claimants who are entitled to collect on the bond. Conversely, Executive and Precision contend that the statute was enacted to protect claimants such as themselves or businesses who provide appraisals or credit reports for consumer home buying and that the statute was not meant to protect against defaults on private loans.[4]

We first address whether the trial court correctly determined that Executive and Precision were entitled to the bond. To answer that question, we must interpret the statutes under the familiar analysis set forth in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). We begin with the text and context of the relevant statutes. *Id.* at 611.

ORS 59.925, provides, in part:

"(2)  A mortgage banker or *mortgage broker is liable as provided in subsection (3) of this section to any person who suffers any ascertainable loss* of money or property, real or personal, *in a mortgage banker transaction or a mortgage*

---

[4] Executive's and Precision's primary contention on appeal is that the Grafs failed to present a *prima facie* case that they were misled by Anderton. ORS 59.925(2)(b). That argument was not presented to the trial court, and we will not consider it on appeal. *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988).

*broker transaction* if the mortgage banker or mortgage broker:

"(a)   Transacts business as a mortgage banker or mortgage broker in violation of any provision of ORS 59.840 to 59.980; or

"(b)   Transacts business as a mortgage banker or mortgage broker by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

"(3)   The person suffering ascertainable loss may recover damages in an amount equal to the ascertainable loss."

(Emphasis added.) All the parties agree that the actions giving rise to the claims in this case involved a mortgage banker or broker and, indeed, that all parties suffered ascertainable losses. They disagree, however, as to what constitutes, and whether the parties were involved in, a "mortgage banker transaction or a mortgage broker transaction."

ORS 59.925(1) defines "mortgage banker transaction" and "mortgage broker transaction" as "a transaction in which a person, in order to engage in the transaction, is required to be licensed as a mortgage banker or a mortgage broker under ORS 59.840 to 59.980." Under those statutes, a person is required to be licensed as a mortgage banker or broker only if he or she "engage[s] in residential mortgage transactions * * *." ORS 59.845(1). Finally, a residential mortgage transaction is defined as "a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained in property upon which four or fewer residential dwelling units are planned or situated * * *." ORS 59.840(9).

The Grafs contend that Executive and Precision are not entitled to the bond proceeds because any party who supplies appraisals or credit reports to a broker does not suffer an ascertainable loss "in a * * * mortgage broker transaction"

within the meaning of the statute. According to the Grafs, Executive and Precision suffered loss not from creating a mortgage on a mortgage broker transaction but rather from supplying services to a broker who was engaged in such a transaction. In other words, while the services that Executive and Precision provided may have assisted the mortgage broker in the transaction, the loss itself does not arise out of the act of creating a security interest in a piece of property.

While the text of ORS 59.840(9) refers to a transaction in which a mortgage or deed is created or retained, it does not specify what people or parties are meant to be included when it refers to a mortgage or deed being created or retained. Stated differently, the statute could be interpreted to refer only to those who are direct parties to the transaction, but it can also be read to encompass anyone who provides any service during the course of the transaction. The context of the relevant statutes does not help resolve that question. For example, ORS 59.925(2) refers to "any person." Because either interpretation is reasonable, ORS 59.840(9) and ORS 59.925 are ambiguous.

We turn to the legislative history. *PGE*, 317 Or at 611. Both parties below submitted extensive legislative history to the trial court that specifically addresses the issue raised here, namely, whether the bond is meant to cover misdeeds between the broker and parties such as Executive and Precision. The legislative history uniformly reflects that the intention behind the bond requirement was to protect consumers who gave money to the mortgage broker for incidentals, such as appraisal and credit reports, and the broker then never paid for those services. For example, the House Committee on Commerce heard testimony that, before the law's enactment, statutes did not provide monetary coverage *for the consumer* in the case of a dispute and that the bonding requirement would therefor help address that deficiency. Testimony, House Committee on Commerce, Subcommittee on Business, HB 3121, Mar 16, 1993, Ex F (statement of Dennis Jordan). Jordan, the vice president of a mortgage company, explained that it is typical for mortgage brokers to require a borrower to pay, in advance, out-of-pocket expenses incurred on behalf of the borrower before closing, such as appraisals and credit reports. Requiring a bond would ensure

that money was available for the recovery of any such advance expenses paid by the consumer, "should he or she prevail in the dispute." He also explained that the bond itself gives the consumer more protection in the event that he or she loses money and establishes a right of action against the bond in the event that a loss does occur. In response to questioning from legislators, Jordan clarified that the purpose of the bond was not to cover loan defaults but rather to provide an asset that "is available for attachment by the *consumer should they prevail in a dispute and the banker or broker * * * refuses to pay that in any other way.*" Tape Recording, House Committee on Commerce, Subcommittee on Business, HB 3121, Mar 16, 1993, Tape 60, Side A (statement of Dennis Jordan) (emphasis added).

Similarly, Assistant Attorney General Terry Ann Leggert testified that one of the problems the bonding requirement was aimed at solving was instances in which the broker takes funds from the consumer for appraisals or other services and the broker in turn does not pay for such services. Testimony, House Committee on Commerce, Subcommittee on Business, Mar 29, 1993, Ex D (statement of Terry Ann Leggert). Leggert was also concerned that the monetary amount, $10,000 (at that time the amount of the proposed bond was $10,000), would be insufficient if multiple consumers were damaged in excess of the fees paid.[5] Further, David Shirk, vice president of a mortgage broker company, testified that, although no bond could be high enough to cover every misdeed, it would often be enough to cover the costs paid by consumers, up front, for things such as appraisals and credit reports. Testimony, House Commerce Committee, Subcommittee on Business, Apr 6, 1993, Ex C (statement of David J. Shirk). He clarified that it is not the amount of money being borrowed that is at risk; rather, it is the advance payments made by consumers to pay initial costs that were at risk.

---

[5] Specifically, she stated:

"While fees range from $75 to $750, the average is $150 to $350. If the business has 100 consumers, the $10,000 bond is insufficient. Moreover, there is [the] possibility that the consumer is damaged in excess of the fees paid. For example, if the broker does not process the application in a timely fashion, the interest rates could change and the cost of the loan would be higher."

As evident from the legislative history, then, the legislature, by enacting a bonding requirement, intended to protect those consumers who paid brokers money for certain fees in advance when the brokers failed to pay for or did not provide the services. At the very least, the legislative history answers the question that the statute's text did not, that is, who is considered to be a part of the transaction such that it could be said that he or she suffered a loss arising from it. Based on the consistent focus on the relations and actions between the broker and the consumer, the statute protects only those directly involved in the creation of a mortgage or deed and not those who peripherally provide services that help structure the transaction. To interpret the statute in any other manner would cast a net so broad as to cancel out the obvious consumer protection that the statute provides. Further, such a construction is consistent with the amount of the bond as well. If we were to construe the statute to permit any party that had anything to do with the transaction to make a claim against the bond, $50,000 would rarely be enough to satisfy every wronged party. Executive and Precision are not consumers who were deprived of advance fees they paid to a broker; rather, they are parties who provided services to a mortgage broker, who in turn did not pay them for their services. In sum, Executive and Precision are simply unpaid creditors of Mortgage One, and the trial court erred in granting summary judgment to the contrary.

■ However, the consumer protection orientation shown in the legislative history equally demonstrates that private lenders, such as the Grafs, are also not within the class of claimants who can validly claim against the bond. As stated, the bond was intended to protect consumers who give a broker money for incidentals, such as appraisals and credit reports. As testified to by Jordan and Shirk, the bond requirement simply was not intended to cover loan defaults or the entire amount of money that was being borrowed, only those advance payments made by the consumer. In this case, the Grafs are not consumers—they are private lenders who, through a private loan arranged by Anderton, loaned money to the Keeners. In that transaction, it is only the Keeners who, if they had paid for appraisals or credit reports in advance, would have been able to recover those amounts

against the mortgage broker. The trial court did not err in denying summary judgment to the Grafs on their direct claim.

In sum, none of the parties was entitled to summary judgment based on the theories that each advanced.

Judgment in favor of respondents reversed and remanded; otherwise affirmed.